**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Jerome S.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 18 CV 6095** |
| | ) | |
| **ANDREW SAUL, Commissioner of** | ) | **Magistrate Judge Jeffrey Cummings** |
| **Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant, Jerome S. ("Claimant") brings a motion for summary judgment to reverse the

final decision of the Commissioner of Social Security ("Commissioner") that denied Claimant's

claim for Supplemental Security Income under 42 U.S.C. §1614(a)(3)(A) of the Social Security

Act ("the Act"). The Commissioner brings a cross-motion for summary judgment seeking to

uphold its decision to deny benefits. The parties have consented to the jurisdiction of the United

States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this

matter pursuant to 42 U.S.C. §§405(g) and 1382(c)(3). For the reasons stated below, Claimant's

motion for summary judgment to reverse the final decision of the Commissioner [21] is granted

in part, and the Commissioner's motion for summary judgment [25] is denied.

---

[1] Andrew Saul is substituted for his predecessor, Nancy A. Berryhill, pursuant to Federal Rule of Civil
Procedure 25(d). In addition, Northern District of Illinois Internal Operating Procedure 22 prohibits
listing the full name of the Social Security applicant in an opinion. Therefore, only plaintiff's first name
and the first initial of his last name shall be listed in this opinion.

# I. BACKGROUND

## A. Procedural History

On June 4, 2015, Claimant filed an application for Supplemental Security Income ("SSI"), alleging disability beginning February 10, 2014.[2] (R. 168-73.) His claim was initially denied on September 30, 2015, and upon reconsideration on January 26, 2016. (R. 71-78, 80-90.) Claimant filed a hearing request on February 11, 2016 pursuant to 20 C.F.R. §404.929 *et seq*, and participated in a video hearing on June 8, 2017. (R. 20, 37, 44-59.) On December 20, 2017, the ALJ issued a written decision denying Claimant's claims for SSI. (R. 17-29.) Claimant then requested review by the Appeals Council. (R. 167.) On August 8, 2018, the Appeals Council denied his request for review, at which time the ALJ's decision became the final decision of the Commissioner. (R. 1–5); *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action in the District Court.

## B. Medical Evidence In The Administrative Record

Claimant seeks SSI for back pain. The administrative record contains the following medical evidence that bears on Claimant's claim:

### 1. Evidence from Claimant's Treating Physicians

On February 10, 2014, Claimant suffered a back injury in a motor vehicle crash. (R. 589, 592, 614.) Claimant sought treatment for his back pain in the months following the accident. (R. 589-609, 626-28, 638-42.) Physical therapy did not provide relief. (R. 602.) On August 22,

---

[2] Supplemental security income is not payable prior to the month following the month in which the application was filed (20 C.F.R. §416.335); therefore, the ALJ determined whether the Claimant had been under a disability within the meaning of the Social Security Act since June 4, 2015. (R. 21.) In order to provide a thorough review of the Claimant's complaint, however, the ALJ and this Court consider Claimant's complete medical history consistent with 20 C.F.R. §416.912.

2014, Claimant had an MRI that identified bulging disks. (R. 330.) At an appointment that same day, Claimant was assessed to have back pain as well as morbid obesity. (R. 331.)

On February 13, 2015, Claimant had a right L5 and S1 decompression with laminotomy, foraminotomy, and partial facetectomy performed by Dr. Anis Mekhail at the University of Illinois Chicago Hospital ("UIC"). (R. 426.) He reported that he was doing well at his initial post-operative visits with Dr. Mekhail on February 27 and March 13, 2015. (R. 363-64, 367, 404, 406.)

Claimant later reported repeated pain during a May 22, 2015 follow-up appointment with Dr. Mekhail. (R. 400.) Claimant's MRI revealed an L4-L5 foraminal narrowing more on the right side as well as L5-S1 foraminal narrowing, and surgery was discussed to redo the decompression as well as an L5-S1 spinal fusion. (R. 401.) As a result, Claimant had an additional surgery on July 17, 2015 that involved S1 decompression, L5 decompression, and L5-S1 posterior spinal fusion. (R. 342.) His postoperative diagnosis was documented as L5-S1 degenerative disk disease, retrolisthesis, recurrent stenosis, recurrent right lumbar radiculopathy. (R. 342.) The procedure went forward with no complications, and Claimant was discharged on July 20, 2015. (R. 342-43.)

During Claimant's August 7, 2015 follow-up appointment, he was noted to be healing well and starting physical therapy shortly. (R. 545-46.) Claimant next saw Dr. Mekhail on September 4, 2015 and reported still feeling severe lower back symptoms as well as some radiculopathy. (R. 543.) Claimant was unable to complete physical therapy due to the pain he was experiencing. (R. 544.)

Claimant presented to Dr. Keith Schmidt at Pain Centers of Chicago for pain management treatment on November 5, 2015. (R. 478-81.) Claimant complained of mid-low

back pain with radiation to bilateral lower extremities. (R. 478.) He reported that his pain was improved by Norco and Zanflex, and he also admitted to using marijuana. (*Id*.) His pain was an eight out of ten with moderate to severe intensity and a dull ache that was sharp at times. (*Id*.) Dr. Schmidt noted that Claimant had a positive straight leg test and negative crossed straight leg test. (R. 480.) His strength was five out of five in the lower extremities bilaterally, and his gait was a normal stride with the use of a cane. (R. 480.) Claimant's medications were adjusted and the importance of weight loss was discussed with him. (R. 481.)

On November 6, 2015, Claimant was seen by Dr. Mekhail for a postop follow-up. (R. 541.) He continued to have some lower back pain but no lower extremity radicular symptoms. (*Id*.) Dr. Mekhail documented that Claimant was doing reasonably well postop but that his pain had not improved since the last clinic visit. (R. 542.) Alternative physical therapy options as well as pain treatment plans were discussed, and a back brace was ordered. (*Id*.) Claimant was placed on light duty work restrictions with a ten-pound weight limit. (*Id*.)

Claimant next presented to Pain Centers of Chicago on December 3, 2015. (R. 482.) His pain was an eight out of ten and constant, severe, and sharp. (*Id*.) His pain control was described as adequate with present medication, and he was wearing his back brace. (*Id*.) Claimant reported that he was weaning himself off marijuana, and his prescriptions were refilled. (R. 483.)

On January 21, 2016, Claimant was again seen at Pain Centers of Chicago. (R. 485.) He was wearing his brace and reported that his physical therapy was increased to three times a week, which was giving him greater flexibility and increased range of motion. (*Id*.) Claimant, however, also noted that physical therapy aggravated his pain and required an extra Norco. (*Id*.) He received a TENs unit for usage on physical therapy days and had been happy with the result.

(*Id*.) Claimant admitted to using marijuana once and was advised that his medication may be discontinued if he tested positive again. (R. 487.)

Claimant was next seen at Pain Centers of Chicago on March 3, 2016, at which time his pain was again an eight out of ten and was described as constant, severe, and sharp. (R. 488.) He reported that he had been attacked by a mentally-ill relative, which increased his pain but did not dislodge the surgical hardware that had been placed in his spine. (*Id*.) Claimant finished six months of physical therapy the week prior and was noted to wear his back brace intermittently and use the TENs unit daily. (*Id*.) His straight leg test was negative bilaterally. (R. 489.) Claimant stated that he had not used marijuana during the past 35 days; nevertheless, he was again cautioned this his prescription medication could be discontinued if he used marijuana. (R. 490.)

Claimant saw Dr. Mekhail for a follow-up visit on March 11, 2016, at which time he reported injuring his back after being attacked by an inebriated family member a few weeks prior. (R. 538.) Claimant explained that he went to an outside hospital for x-rays because of the pain in his back. Dr. Mekhail noted that those x-rays were not available but that Claimant continued to have back pain. (R. 538-39.)

A CT scan was performed on April 1, 2016 to check Claimant's surgical site, and it confirmed that there was no movement in the hardware following the surgery. (R. 536-37.) Claimant was referred to Dr. Amir El Shami for pain modality relief and continued to be placed on light duty restrictions with a ten-pound weight limit. (R. 537.)

On April 14, 2016, Claimant went once more to Pain Centers of Chicago. (R. 491.) He was not wearing his back brace and reported that he only wore it "now and then." (*Id*.) His pain was again described as an eight out of ten. (*Id*.) Claimant, who originally stated that he stopped

using marijuana, admitted to regular use after his drug test was positive. (*Id*.) Claimant was discharged from care due to his violation of his narcotic agreement. (R. 492.)

On June 6, 2017, an X-ray of the lumbar spine was performed and showed no evidence of hardware failure or spondylolisthesis. (R. 646.) A subsequent MRI was performed on June 15, 2017, and the radiologist's impressions noted multilevel lumbar spondylosis and degenerative disc disease that was most pronounced at L3-4 and L4-5. (R. 651.)

Claimant was seen by Dr. El Shami at UIC on June 17, 2016. (R. 513.) He was new to the clinic and said that he had minimal pain in his back following his July 2015 surgery with Dr. Mekhail, but he was assaulted seven months after the surgery and has had pain ever since. (R. 533.) Claimant reported being fired from the last pain clinic due to his marijuana usage, which he said he used for pain control. (*Id*.) He explained that he wears the brace almost all of the time and that it helped quite a bit. (*Id*.) On exam Claimant had pain when bending, flexing, and extension and had a positive straight leg test. (R. 534.) Dr. El Shami documented that Claimant could not be prescribed any chronic pain medication, but was given other prescriptions as well as an order for more physical therapy. (*Id*.) Claimant was referred to a pain clinic for a possible injection. (*Id*.)

A contrast enhanced MRI performed on June 21, 2017 documented that there was no evidence of significant epidural fibrosis/granulation tissue, but that there "may be a subtle/small focus of enhancement within the posterior mesial disc annulus at L3-L4, possibly representing a small annular fissure." (R. 653.)

A medical record for UIC's pain clinic on July 19, 2016 notes that Claimant was upset and verbally abusive when he was informed that the plan was not to prescribe opioids. (R. 500.) Claimant presented to the clinic with sharp, throbbing pressure and tingling lower back and leg

pain. (R. 508.) He informed the clinic that he left his previous clinic to consolidate his treatment at UIC, although it was reported that he was terminated due to testing positive for marijuana. (R. 501.) Claimant said that he wore a back brace every day but did not bring it that day. (*Id*.) He left without finishing his interview, and it was documented that the clinic did not want to follow up with him. (R. 500.)

On July 26, 2016, Claimant presented to Morris Hospital for a medication check. (R. 570.) The nurse practitioner reported that Claimant was unable to get into his pain management clinic and needed a referral for Fox Valley pain management. (*Id*.) He reported to seeing a neurosurgeon, Dr. Ben Taimoorazy, who wanted to do more surgery. (*Id*.) Claimant had no new complaints or weakness. (*Id*.) His gait was normal and there was a decreased range of motion in the lumbar-sacral spine. (*Id*.)

On September 15, 2016, Claimant presented to Morris Hospital complaining of jaw pain and for his Handicap Parking Placard to be filled out. (R. 572.) It was documented that his parking permit was not filled out, but no explanation was given. (R. 573.)

Claimant next went to Morris Hospital on October 11, 2016 for a medication refill because he was unable to get into a pain clinic until late November. (R. 574.) His pain was an eight out of ten, and his Norco prescription was refilled for 30 days. (*Id.*)

On January 10, 2017, Claimant went to see Dr. Steven Blum at a pain clinic in Skokie and reported that his pain was a five out of ten and constant. (R. 582.) His range of motion was limited. (R. 583.) Dr. Blum documented that no medications were prescribed while they awaited drug testing results and that his practice does not prescribe Norco. (*Id*.) On January 12, 2017, Claimant went to Morris Hospital for medication because he would be unable to get

medicine from his new pain clinic until February.  (R. 576.)  The nurse practitioner spoke to the treating doctor at the pain clinic, who approved a Norco refill.  (*Id*.)

Claimant presented to the pain clinic on January 26, 2017, complaining of pain that was a ten out of ten in his back and right leg.  (R. 586.)  Dr. Dickson Wu noted that the Illinois Prescription Monitoring Program Database showed that the controlled substance agreement had been adhered to, and his medication was refilled.  (*Id*.)  Claimant next saw Dr. Wu on April 27, 2017 with back pain that was an eight out of ten and requested a medication refill.  (R. 588.)

On June 23, 2017, Claimant was seen by Dr. Eldin Karaikovic, an orthopedist.  (R. 655-56.)  Dr. Karaikovic reported that Claimant had L4-5 spinal stenosis, which was likely the cause of his back pain, and recommended a non-operative treatment plan.  (R. 656.)  Claimant was seen at Healthcare Centers of Morris Hospital on June 27, 2016 for his back pain.  (R. 568.)  He reported that he would be transferring his care to the UIC pain clinic and needed a Norco prescription in the meantime.  (*Id*.)  He was given a 30 day prescription.  (R. 569.)

## 2.      Evidence from Agency Consultants

Dr. Michael Nenaber completed an evaluation report on September 30, 2015.  (R. 72-76.)  Dr. Nenaber opined that Claimant had the following exertional limitations: occasionally lift or carry 20 pounds; frequently lift or carry ten pounds; stand and/or walk for a total of six hours in an eight hour workday; sit for a total of six hours in an eight hour workday; occasionally climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; and occasionally stoop.  (R. 75.)

On reconsideration, Dr. James Hinchen documented Claimant's increased complaints of pain as well as the restrictions caused by his chronic back pain.  (R. 88.)  Dr. Hinchen opined that while Claimant's medical history could reasonably be expected to produce the alleged symptoms, the intensity and impact on functioning are not consistent with the totality of the

evidence.  (*Id*.)  Dr. Hinchen slightly modified the postural limitations and added that Claimant could not have concentrated exposure to extreme cold, vibration, or work hazards such as machinery or heights.  (R. 87-88.)

### C.      Evidence from Claimant's Testimony

 Claimant testified via video on June 8, 2017.  (R. 37, 39.)  At the time of his testimony, he was 42 years old.  (R. 44.)  He explained that he has a driver's license but cannot drive because of his medications.  (R. 45.)  He is a high school graduate and previously worked as a forklift operator, but he can no longer operate heavy machinery due to his medication.  (R. 45-47.)  He has applied for jobs since he applied for SSI that would meet the restriction requirements given to him by Dr. McHale such as no bending, no twisting, no heavy lifting, and no walking for long periods of time.  (R. 45-46.)

Upon questioning about his two back surgeries, Claimant informed the ALJ that the first surgery helped for a month before his back got worse.  (R. 48.)  The second surgery helped with the sciatic nerve pain down his leg but not with the lower back pain.  (*Id*.)  Claimant placed particular emphasis on the persistence and sharpness of his pain.  He described it as "throbbing, aching, uncomfortable, [and] miserable" to the degree that it makes him moody.  (R. 49).  His pain level varies but averages at about eight out of ten each day.  (R. 49-50).  The pain is constant, although the medication relieves the "agony" of it when he is laying down or resting.  (R. 49.)   The pain can sometimes be a ten on a scale of one to ten, but it is usually an eight.  (R. 49-50.)  Claimant takes the pain medications Norco and Gabapentin daily.  They help to some degree also create side effects such as drowsiness, sluggishness, and a lack of concentration.  (R. 50.)  On other days, however, these medications do not provide Claimant with any relief "and the only thing that does help is marijuana."  (R. 52).  Claimant further testified that his pain prevents

him from sitting for long periods of time. He told the ALJ, for example, that his back felt "like there's two softballs smashing together right now" after sitting during the hearing. (R. 58).

Claimant further testified that he is consistent in seeking out prescriptions from his prescribing doctor, Dr. Wu, every three months. (*Id.*) Claimant had been to other pain clinics in the past, but switched around because some would not take his insurance and others would not readjust medicine. (R. 51.) Upon questioning from the ALJ about a clinic stopping treatment because Claimant tested positive for marijuana, he explained that he ended treatment at that clinic because of their proposed treatment. (*Id.*) He testified that he uses marijuana two to three times a month to help with the pain. (R. 51-52.)

Claimant testified that he was wearing his back brace and that he wears it all day except when bathing, sleeping, or going in a car. (R. 52.) He has been wearing the brace regularly since his last surgery, about two and a half years ago. (*Id.*) He uses a TENS unit two or three times a week and testified that it helps somewhat. (R. 53.) He had a cane at his hearing and explained that he has used it every day for about two years. (*Id.*) He explained that he can stand without his cane for about five minutes at a time and can walk fifteen feet without his case, twenty-five feet with the cane. (R. 53-54.) He can sit for five to fifteen minutes at a time and cannot lift more than ten pounds. (R. 54.)

Claimant also testified about his activities of daily living ("ADLs"). Claimant lives with his mother, who does most chores for him. He does not do laundry, cleaning, or cooking. Claimant stated that he tried each of these activities – including washing dishes – but the standing that they require prevented him from carrying out these tasks. (R. 44, 54-55.) Claimant's nighttime routine is also disrupted because he experiences difficulty in sleeping

through the night.  As a result, Claimant stated that he needs to take naps during the day that vary from two to three each day for one to four hours.  (R. 57).

Claimant's mother also appeared at the hearing and testified.  She stated that Claimant had "extremely limited" mobility that prevents him from doing house or yard work.  (R. 60). Claimant has to walk the few stairs that lead into his part of the house "one at a time but sideways" and puts both feet on a stair before proceeding to the next.  (R. 61).  Claimant's mother testified based on her observation that Claimant's pain level, the side effects from his medication, and his low energy level rendered him incapable of work since February 2014 (R. 63).  Claimant's mother further testified that Claimant was "sluggish and sleepy" and that his concentration was "short term" when he takes his medicine.  (R. 61-62).

## II. LEGAL ANALYSIS

### A.      Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g). Consequently, this Court will affirm the ALJ's decision if it is supported by substantial evidence. *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015).  Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "  *Biestek v. Berryhill,* 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1983).

This Court must consider the entire administrative record, but it will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for

that of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Court will focus on whether the ALJ has articulated "an accurate and logical bridge" from the evidence to his/her conclusion. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). At a minimum, the ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.' " *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (per curiam), *quoting Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985) (internal quotations omitted). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008).

**B.      The Standard For Proof Of Disability Under The Social Security Act**

In order to qualify for SSI, a claimant must be "disabled" under the Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers

conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon,* 270 F.3d at 1176. Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885–86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id*. at 886.

### C.     The ALJ's Decision

The ALJ applied the five-step analysis required by the Act. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since June 4, 2015, the application date. (R. 22.) At step two, the ALJ found that Claimant had the following severe impairments: lumbar degenerative disc disease and radiculopathy, and obesity. (*Id.*) Next, at step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1). (R. 23.) At step four, the ALJ found that Claimant had the RFC to perform a limited range of light work with no lifting or carrying over ten pounds; no climbing ladders, ropes, or scaffolding; occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs; and no concentrated exposure to extreme cold, vibration, or hazards (defined as work at heights or around dangerous moving machinery like a forklift). (*Id.*) Accordingly, the ALJ found that Claimant was unable to perform any past relevant work. (R. 27.)

Lastly, at step five, the ALJ found that given Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers that Claimant could perform, such as document preparer, a preparer, and a ticket counter. (R. 28.) Therefore, the ALJ found that Claimant has not been under a disability since June 4, 2015. (*Id.*)

## III. DISCUSSION

Claimant argues that the ALJ erred (1) by failing to address the Step 3 issue correctly and (2) improperly assessing his RFC. The RFC claim primarily involves objections to the ALJ's symptom analysis, which the Court also addresses. Because the Court agrees that the ALJ incorrectly assessed Claimant's symptoms and RFC, it does not discuss the Step 3 issue.

### A. The ALJ Must Reconsider Claimant's Symptom Testimony

Once an ALJ determines that a claimant has a medically determinable impairment, the ALJ must evaluate the intensity and persistence of the symptoms that can reasonably be expected to stem from it. A court may overturn a symptom evaluation if the ALJ fails to justify his or her conclusions with specific reasons that are supported by the record. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). An ALJ's analysis should consider the claimant's daily activities; the frequency and intensity of his symptoms; the dosage and side effects of medications; non-medication treatment; factors that aggravate the condition; and functional restrictions that result from or are used to treat the claimant's symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p. When considering a claimant's symptoms, the ALJ must build a logical bridge between the symptom evaluation and the record. *See Cullinan*, 878 F.3d at 603; *Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009) (requiring an analysis of the SSR 16-3p factors as part of a logical bridge for the symptom evaluation).

As these factors indicate, an ALJ must consider the claimant's ability to engage in daily activities. *See Schreiber v. Colvin*, 519 Fed.Appx. 951, 961 (7th Cir. 2013) (stating that courts have "repeatedly emphasized that an ALJ is supposed to consider a claimant's limitations in performing household activities") (citing cases). Claimant told the ALJ that he could not perform normal household tasks like doing laundry, washing dishes, cleaning, or cooking. His mother has to help him at times with bathing and even doing simple tasks like making breakfast. (R. 54.) His mother confirmed this testimony at the hearing.[3] (R. 59-60.) Claimant further stated in his written function report that his day largely consists in bathing, taking a "small walk with a walker," and sitting in a chair until it is time for bed. (R. 251.) The ALJ did not provide any explanation of how she evaluated these statements. Indeed, the Commissioner concedes that the ALJ did not even consider the ADLs in his decision. (Dckt. 26 at p. 13.) An ALJ cannot evaluate a Claimant's symptom testimony without first recognizing what he stated on the topic.

Instead of ADLs, the ALJ cited a number of what she considered to be inconsistencies in Claimant's testimony. The Court agrees with the ALJ's analysis of two of Claimant's statements. Claimant told the ALJ that he wore a back brace at all times but the record plainly refutes that claim. (R. 491, "States wears it [back brace] now and then.") Claimant also told the ALJ that his pain medications caused side effects and inhibited his ability to concentrate. As the ALJ pointed out, however, Claimant told one of his doctors on April 14, 2016 that he had no side effects. (R. 491.)

---

[3] The ALJ failed to consider the testimony of Claimant's mother. SSR 16-3p states that when a disability decision cannot be made solely on the objective medical evidence, an ALJ should "carefully consider other evidence in the record" that includes "statements from parents and other relatives." 2017 WL 5180304, at *6. The ALJ is directed to evaluate the testimony of Claimant's mother for both the symptom analysis and the RFC. *See Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) ("The ALJ must determine an individual's RFC . . . based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family[.]") (internal quotes and citation omitted).

That said, the remainder of the ALJ's discussion fails to draw a logical bridge between the record and her conclusion about Claimant's testimony. The ALJ attempted to find other inconsistencies in Claimant's testimony that she did not fully substantiate with evidence. The first involved Claimant's ability to travel. The ALJ claimed that he testified "that he never went to Colorado since his alleged onset date." (R. 26.) The ALJ disputed that alleged testimony by noting that Claimant told one of his doctors in April 2016 that he had been in Colorado, (R. 491), thereby implying that he was less limited than he stated. The problem with that claim is that the ALJ never asked Claimant if he had traveled to Colorado after his onset date of June 4, 2015; she asked instead, "do you go to Colorado?" (R. 56.) That only inquired into whether Claimant was travelling as of the June 2017 hearing without making a clear distinction between the present and the past. The ALJ had no ground for attributing testimony to Claimant that he did not make without questioning him with greater clarity.

The ALJ also took issue with Claimant's testimony about marijuana. Claimant made no secret about his use of marijuana; he told both the ALJ and his doctors that he needed to use it from time to time to ease his pain. (R. 26.) The ALJ tried to contradict that testimony by claiming "that he admitted to regular *recreational* use." (R. 26, emphasis added.) The evidence that the ALJ cited, however, does not substantiate her allegation. Claimant tested positive for marijuana at an April 14, 2016 examination. The treatment note related to that examination states that he admitted "to regular use" but says nothing about whether Claimant's purpose was recreational or medicinal. (R. 491.) The ALJ returned to the marijuana issue once more by stating that Claimant was kicked out of a pain treatment program due to his marijuana use. The entry she cited, however, does not mention marijuana. Instead, Dr. Votta-Velis stated on July

19, 2016 that Claimant would no longer be seen in the pain clinic because he became verbally abusive when he was denied a prescription for opioid pain medication. (R. 500.)

The ALJ further doubted Claimant's testimony on the ground that a nurse practitioner refused to fill out a handicapped parking application for him on June 23, 2017. The ALJ appears to have assumed that the nurse's action was relevant to the merits of Claimant's SSA allegations but "the State of Illinois definition of disability set out on the handicapped parking application is distinct from the standard employed by the SAA in determining whether an individual is entitled to benefits." *Halsell v. Astrue*, No. 06-3013, 2009 WL 10706296, at *8 (C.D.Ill. March 25, 2009); *see also Lee v. Berryhill,* No. 2:17-CV-0033, 2018 WL 1191133, at *4-5 (E.D.Tenn. Feb. 15, 2018), *report and recommendation adopted,* 2018 WL 1189908 (E.D.Tenn. Mar. 7, 2018) (citing cases). Moreover, the ALJ failed to note the context in which the nurse refused to complete Claimant's paperwork: a June 2017 consultation that involved a follow up for a recent ER visit for jaw pain. (R. 572.) The ALJ provided no explanation of why the nurse's refusal to sign permit papers following an appointment for jaw pain was relevant to Claimant's back condition – or even if the nurse was qualified to evaluate Claimant's back pain.

Most importantly, the ALJ failed to provide any reasonable account of Claimant's allegations of pain. Claimant testified that his pain level averaged an eight on a scale of one to ten but that it could spike as high as ten. (R. 49-50.) He takes his pain medication regularly but it does not always provide adequate relief. (R. 50.) The ALJ addressed these claims only by noting that Claimant's pain medications helped to relieve his symptoms, that his neurological exams were normal, and that he had been on his pain medications "for quite some time." (R. 25-26.)

The Court is unable to follow the basis of the ALJ's pain analysis. She cited a June 2017 consultation with Dr. Eldin Karaikovic to claim that Claimant's pain could not have been as great as he stated because he had "normal neurological functioning." It is true that the doctor stated that Claimant had "no pathologic reflexes," showed a "normal lumbar-femoral rhythm," and had normal sensation. (R. 655.) The ALJ implied that Dr. Karaikovic thought that these findings were somehow relevant to Claimant's complaints but Dr. Karaikovic never made *any* connection between pain and Claimant's reflexes. To the contrary, he pointed out that a new MRI showed lumbar spondylosis at several lumbar vertebrae and "moderate to severe central spinal and bilateral foraminal stenosis" that was "probably the primary cause of his back pain." (R. 656.) The ALJ overlooked these findings and failed to note that Dr. Karaikovic credited Claimant's complaints regarding his back pain and raised the possibility of additional surgery. (R.655-56).

The ALJ did note that Dr. Karaikovic recommended an epidural injection and physical therapy for pain but did not explain what that implied about Claimant's condition. Conservative modalities like an injection and therapy can suggest that a claimant's pain is not severely restricting. The ALJ did not say that, however, and the fact that claimant receives conservative care is relevant *if* the claimant is able to manage his or her impairments without requiring more aggressive measures. *See Geer v. Berryhill*, 276 F.Supp.3d 876, 887 (E.D.Wis. 2017) ("In some cases the resort to conservative treatment would warrant an inference that the underlying symptoms are not especially limiting, for example, if someone alleges crippling pain but takes only the occasional aspirin."). An ALJ cannot rely on the conservative nature of care to discount a claimant's testimony when the treatments he or she received did not work. *See Pickup v. Colvin*, 606 Fed.Appx. 430, 433 (10th Cir. 2015). To this point, Dr. Karaikovic noted that

physical therapy had not been effective in the past. (R. 655). She also noted that Claimant was taking Norco, Tizanidine, and Gabapentin for pain. (R. 655). Insofar as the ALJ even relied on the conservative nature of care, therefore, she was required to account for all that Dr. Karaikovic stated about Claimant's condition.

The ALJ also overlooked the MRI on which Dr. Karaikovic's note was based. Claimant had a new MRI done on his lumbar spine on June 15, 2017. It showed multilevel spondylosis and degenerative disc changes that were most pronounced at L3-L4 and L4-L5 as well as disc bulging at L1-L2 and L2-L3 and a mild disc protrusion at L5-S1. (R. 650-51.) Dr. Karaikovic noted that Claimant had some flexion to his midthighs and lateral bending but that it was "all very painful" upon examination. (R. 655.) This evidence was relevant to Claimant's pain allegations, and the ALJ could not explain the basis of her reasoning by ignoring what Dr. Karaikovic said about the MRI. *See Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) ("And while an ALJ need not mention every piece of evidence in her opinion, she cannot ignore a line of evidence that suggests a disability."); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

Along similar lines, the ALJ also failed to consider much of what Claimant told her about his pain medication. Claimant stated that medication helped his pain but that it still averaged an eight out of ten. That was consistent with numerous record entries showing that Claimant reported pain from a five to ten out of ten – but mostly reporting it to be an eight – even when he took pain medication. (R. 478, 482, 488, 491, 574, 582, 586.) As with Dr. Karaikovic's report, however, the ALJ overlooked this entire line of evidence. Remand is therefore required so that

the ALJ can consider the complete record and build a logical bridge between the record and her symptom evaluation.

**B.      The ALJ Should Restate the Reasons for the RFC Assessment**

The RFC addresses the maximum work-related activities that a claimant can perform despite the limitations that stem from his or her impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The RFC must accommodate all of a claimant's limitations that are supported by the record. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). In addition, an ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. That includes an explanation of why the claimant is able "to perform sustained work activities in an ordinary work setting on a regular and continuing basis" eight hours a day for five days a week. *Id*. Since the RFC is closely related to a symptom analysis, the Court only briefly addresses the ALJ's reasoning on this issue. *See Outlaw v. Astrue*, 412 Fed.Appx. 894, 897 (7th Cir. 2011) (noting that "RFC determinations are inherently intertwined with matters of credibility").

The ALJ found that Claimant could carry out light work but could only lift up to 10 pounds and climb stairs occasionally. She supported that assessment by giving "controlling" weight to a November 6, 2015 note from Dr. Anis Mekhail stating that Claimant could lift up to 10 pounds at a time and perform light work. (R. 542.) The Commissioner argues that no further consideration of the RFC is necessary in this case because Claimant has failed to dispute the ALJ's assessment of Dr. Mekhail's note. That would ordinarily be true when a claimant does not address key evidence that supports the ALJ's finding. In this case, however, the ALJ's reasons

for accepting Dr. Mekhail's note must be addressed because they are clearly erroneous and cast doubt on the ALJ's account of the record.[4]

The ALJ provided two reasons for giving controlling weight to Dr. Mekhail. First, she claimed that the doctor's opinion was consistent with Claimant's normal neurological findings. (R. 27.) That reasoning fails for the reasons addressed above, *supra* at Sec. III(A). Second, she also found that Dr. Mekhail's assessment was consistent with the record as a whole. It is well settled, however, that such generalized references to the record are inadequate even when an ALJ has accurately reviewed the evidence. *See Elmalech v. Berryhill*, No. 17 C 8606, 2018 WL 4616289, at *10 (N.D.Ill. Sept. 26, 2018) ("Merely summarizing the record, however, is not in itself a substitute for an ALJ's duty to explain the basis of [his findings]."); *Alevras v. Colvin*, No. 13 C 8409, 2015 WL 2149480, at *4 (N.D.Ill. May 6, 2015); *Chuk v. Colvin*, No. 13 C 8409, 2015 WL 6687557, at *8 (N.D.Ill. Oct. 30, 2015). Instead of generalizations, an ALJ must always describe "how the evidence supports each [RFC] conclusion." SSR 96-8p, 1996 WL 374184, at *7.

Even if that were not the case, the ALJ did *not* accurately review the relevant medical evidence. The ALJ overlooked that as part of the finding that Claimant could do light work Dr. Mekhail also stated that Claimant "currently just takes ibuprofen for his pain management." (R. 541.) That was not always the case, however, and the ALJ herself noted that Claimant took strong narcotic medications and muscle relaxants such as Norco, Tizanidine, and Gabapentin and that "his doctor has maintained him on the same medications . . . for quite some time." (R. 26.)

---

[4] Courts can *sua sponte* address issues in social security cases that a party has not raised. *See Mangan v. Colvin*, No. 12 C 7203, 2014 WL 4267496, at *1 (N.D.Ill. Aug. 28, 2014) (citing cases); *see also JSB-1 v. Saul*, No. 3:18-cv-266, 2019 WL 2482714, at *2 n.2 (N.D.Ind. June 14, 2019) ("Nonetheless, if Plaintiff had made *no* attempt to present this argument, the argument may still have supported remand here, because a reviewing court may *sua sponte* address issues in social security cases.") (internal quotes and citation omitted) (emphasis in original).

The Court notes that as of July 6, 2017 – two-and-a-half years after Dr. Makhail's note –
Claimant was taking Norco, Tizanadine, Gabapentin, and Morphine. (R. 645-46.) A claimant
who can perform light work when his pain can be managed with ibuprofen may not be able to do
so if he subsequently requires narcotics like Norco and Morphine. The ALJ could not adopt Dr.
Mekahil's assessment without explaining why Claimant could perform light work when he
required far more pain medication that Dr. Mekahil stated. She was also obligated to explain
why Dr. Mekahil's RFC deserved controlling weight in light of Claimant's June 2017 MRI and
Dr. Karaikovic's assessment of it – both of which the ALJ overlooked. "An ALJ should not rely
on an outdated assessment if later evidence containing new, significant medical diagnoses
reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882
F.3d 772, 728 (7th Cir. 2018); *see also Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016).

The ALJ also failed to explain why Claimant would be able to climb stairs occasionally.
*See Zenka v. Astrue*, 904 F.Supp.2d 884, 900 (N.D.Ill. 2012) ("Occasionally means from very
little up to one-third of the time.") (internal quotes and citation omitted). The ALJ cited a July
2015 physical therapy note stating that Claimant could walk without losing his balance and could
walk up and down 15 stairs while holding on to a railing. (R. 410.) There is little connection
between these observations and the ALJ's finding that Claimant could walk up and down stairs
for several *hours* each day – without holding onto a rail. Remand is therefore required so that
the ALJ can explain what evidence supports such a finding. [5] *See Briscoe ex rel. Taylor v.*

---

[5] The ALJ stated that she gave "great" weight to the opinions of the state-agency experts and adopted
their limitations. (R. 27.) Dr. James Hinchen stated that Claimant could climb stairs occasionally. (R.
87). That report was issued on January 19, 2016. The ALJ reasoned that it "was consistent with the
record evidence" but as stated above, *supra* at Sec.III(B), the ALJ did not properly consider all of the
evidence in this case. Since this case already requires remand, the ALJ should restate the reasons that
support the state-agency reports and Dr. Mekhail's November 2015 treatment note. The ALJ is reminded
that she must apply the factors set out in 20 C.F.R. § 404.1527.

*Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) ("Contrary to SSR 96-8p, however, the ALJ did not explain how he arrived at these [RFC] conclusions; this omission in itself is sufficient to warrant reversal of the ALJ's decision.").

## CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment [21] is granted, the Commissioner's motion for summary judgment [25] is denied, and the decision of the ALJ is remanded to the Social Security Administration for further proceedings consistent with this Memorandum Opinion and Order. Specifically, on remand, the ALJ shall (1) re-evaluate Claimant's symptom testimony, (2) evaluate the testimony of Claimant's mother, (3) restate the reasons for the weight given to the state-agency experts and Dr. Mehail's November 2015 note, and (4) explain more carefully the reasons that support the RFC analysis.

**ENTERED:**

**Jeffrey Cummings**
**United States Magistrate Judge**

**Dated: January 23, 2020**